IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Mark Singer, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 C 3954 |
| | ) | |
| City of Chicago | ) | |
| | ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

Mark Singer was arrested outside of his home in the late evening of October 17, 2012, based on his former employer's allegations of embezzlement. He was released from police custody at approximately 4:00 p.m. the following day. In the interim, Chicago Police officers executed a search warrant on Singer's home and seized numerous valuable items, including firearms, expensive pens, jewelry, and other personal items. City officers inventoried the seized items on October 18, October 19, October 24, and November 1, 2012, designating some of the items as Singer's property and others as the property of his former employer.[1]

---

[1] Nothing in the record indicates how the officers determined who should be identified as the owner of the various items. Plaintiff asserts that the officers "unilaterally designated many of [the items] the property of Plaintiff's former employer, although there was no evidence they were anything but Plaintiff's lawful property." Pl.'s Opp. at 1, ECF 80.

In June of 2014, the Cook County State's Attorney's Office dropped the criminal charges it had pursued based on the conduct that led to Singer's arrest, but most of the items seized from Singer's home remained in the custody of the Chicago Police Department. Some of the items were later sold or destroyed. Singer filed this action in 2018, claiming that the City violated due process by depriving him of his property without notice and an opportunity to be heard, and that it converted his property in violation of state law.[2] At the close of discovery, the City moved for summary judgment. The motion is denied for the reasons below.

The parties agree that a trio of cases—*City of West Covina v. Perkins*, 525 U.S. 234 (1998), *Gates v. City of Chicago*, 623 F.3d 389 (7th Cir. 2010), and *Conyers v. City of Chicago*, 10 F.4th 704 (7th Cir. 2021)—provide a framework for assessing plaintiff's due process claim, although naturally, they disagree about how these cases apply to the facts here. At this juncture, these cases favor Singer.

*West Covina* concerned "whether the Constitution requires a State or its local entities to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution." 525 U.S. at 236. The Court held that "when

---

[2] Plaintiff raised additional constitutional and state claims, but I dismissed these on January 24, 2020. See ECF 34, 35.

2

law enforcement agents seize property pursuant to warrant, due process requires them to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *Id*. at 240. But the Court went on to hold that due process does not require "individualized notice of state-law remedies [that] are established by published, generally available state statutes and case law." *Id*. at 241.

In *Gates*, the Seventh Circuit acknowledged these principles but distinguished *West Covina* on the ground that while the *West Covina* plaintiffs challenged only the adequacy of the notice they received, the *Gates* plaintiffs challenged the both the adequacy of notice and the substantive sufficiency of the state law remedies available for recovering property (specifically, money) seized from them upon their arrest. *See* 623 F.3d at 398. The Seventh Circuit observed that the record contained evidence suggesting that in addition to requiring the *Gates* plaintiffs to present a "Section 108" order (i.e., the putative state law remedy), the City also required "additional documents not prescribed by any state statute," which were obtainable only through "difficult-to-access police department rules." *Id*. at 399. *See also id.* at 405 (referring to the police department's "Form 54," which the evidence suggested may have been "essentially unobtainable" in practice). Further, the court found that it was not clear from the summary judgment record that the notices routinely sent to arrestees at

3

their home addresses were "reasonably calculated" to reach them, since many arrestees "predictably remain[ed] in custody" at the time the notices were sent. *Id*. at 401.

In addition to these factual issues, *Gates* held that to the extent the City's procedures required arrestees "to seek a court order releasing their property" following the conclusion of criminal proceedings against them (and in the absence of forfeiture proceedings), it "improperly place[d] on the arrestee the burden of proof to establish that he had a lawful right to the property." *Id*. at 410–11 (7th Cir. 2010). Moreover, the court found that it could not quantify the significance of that burden on the factual record before it. For all of these reasons, the Seventh Circuit reversed the district court's entry of summary judgment and remanded the case to allow the fact-finder to consider various questions bearing on the plaintiffs' due process claim, including:

> how many arrestees each year "donate" their money to the City and how many reclaim it? What exactly is required of arrestees in order to reclaim their money? If a Section 108 order is required, is it actually available to arrestees, and is it truly a *de minimis* matter to obtain such an order? How many arrestees have their money taken by an officer who checks the "hold for evidence or investigation" box? How many get it back? How many do not? How many Form 54s Chicago police officers sign each year? How many Section 108 orders are entered, and how many are denied? Given the impressive amount of money that goes unclaimed each year by a class of persons who in all likelihood want it back, has the City created a policy that places an impermissible and daunting burden on arrestees to establish an entitlement to money that the City has no right to retain?

4

*Gates* 623 F.3d at 412.

Singer's due process claim raises similar questions, which the record either leaves unanswered or answers in a manner that prevents summary judgment in the City's favor. For example, the City asserts that Singer: 1) was required to present a Section 108 order to recover his property; 2) received notice of this requirement; and 3) could have but failed to invoke the Section 108 procedure. But neither the first nor the second assertion emerges clearly from the undisputed evidence. As to the need for a Section 108 order, the City cites language printed on the back of certain inventory sheets stating:

> If your receipt is marked "Hold for Investigation and/or Evidence," and the property is not money and not subject to any local, state or federal forfeiture laws (including narcotics, gambling or prostitution offenses), *you may get your property back by getting a court order from a criminal court judge*. (See 725 ILCS 5/108, et seq.) You must give the court order, your receipt, and your photo ID to ERPS to get your property back. To find out if your property is subject to forfeiture, you may contact the CPD Asset Forfeiture Unit at (312) 746-7630, Monday through Friday (8:00 a.m. to 4:00 p.m., closed holidays).
>
> If your criminal case is over, and you did not have the judge sign an order for return, *you may get your property back by returning to the CPD facility where your property was inventoried*. Give your receipt to desk personnel and they will help you get a property release order. You must then bring the property release order, your receipt and your photo ID to ERPS to get your property. ...

Pl.'s L.R. 56.1 Resp., ECF 79 at ¶ 15 (emphasis added). A reasonable interpretation of these instructions is that they offer

5

two alternative avenues for recovering property marked "Hold for Investigation and/or Evidence" (as Singer's was). The first, described in the first paragraph, instructs arrestees that they *may* (not "must") obtain "a court order from a criminal court judge" (i.e., a "Section 108" order), which they may use (in conjunction with other documents) to "get [their] property back." The second, described in the second paragraph, is available "[i]f your criminal case is over" (as Singer's was) and "you did not have the judge sign an order for return" (as Singer did not). In such cases, the notice instructs arrestees to present a receipt at "the CPD facility where [their] property was inventoried" and to solicit help from "desk personnel" to obtain a "property release order," which they may use (in conjunction with other documents) to "get [their] property." This release order may or may not be the "essentially unobtainable" Form 54 described in *Gates*—the parties do not say. What can be said, however, is that the notice the City contends Singer received does not clearly inform arrestees in his position that a Section 108 order is *required*, as the City now argues, to recover their property.

As to the second issue—whether Singer actually received the notice the City cites—the record reflects a genuine dispute. The City argues that Singer received actual notice of its procedures printed on "the back of an inventory sheet given to Plaintiff." Def.'s Mem., ECF 70 at 4. Singer contends, however, that he did

6

not receive "Copy 4-Citizen Copy" of the inventory sheet on which the instructions are printed, and which is apparently given to property owners only "if" they are "present" at the police station. *see* Pl.'s L.R. 56.1 Stmt. of Add'l Facts, ECF 79 at ¶ 15 (quoting Special Order S07-01-02, ECF 69-8 at VI.A.5.c.)). Singer insists that he did not receive "Copy 4" (or any copy) of his inventory sheet at the police station, presumably because the property seized from his home was still being inventoried at the time he was released from custody. Further, while it appears that "Copy 3" of the inventory sheet was provided to the criminal court and was thus available to Singer during his criminal proceedings, that copy did not contain instructions for retrieving seized property.

The City tries to brush aside these details, insisting that even if Singer did not receive a physical copy of instructions for retrieving his property, he nevertheless had constructive notice of the relevant procedures because they were available online. It is here that the City invokes *Conyers*, but its reliance is misplaced. In *Conyers*, the plaintiffs claimed that the City violated due process by deeming their seized property abandoned and disposing of it after thirty days, even though the plaintiffs remained in custody throughout that thirty-day period. The Seventh Circuit upheld summary judgment of the plaintiffs' due process claim, focusing its analysis, as the district court had, on three issues: "(1) the adequacy of the content found on the website; (2)

7

the adequacy of inmate access to the website; and (3) proof that the website was active and online during the class period." *Id*. at 712. Both courts concluded that the record raised no triable dispute as to any of these issues. Importantly, the plaintiffs did not dispute that they had received hard copies of a notice that contained instructions for retrieving their property (either themselves or through a designee), which also stated, "[i]nformation on how to get back inventoried property is also available at [www.ChicagoPolice.org](www.ChicagoPolice.org)." *Id*. at 707. Moreover, the parties agreed that "the content of the notice on the website was sufficient" to satisfy due process. *Id*. at 709. Accordingly, the court zeroed in on the issues of the plaintiffs' ability to access that website during their incarceration and whether the website was active at the relevant times. *Id*. at 714-15. Because the undisputed factual record answered both questions affirmatively, summary judgment for the City was appropriate.

The City insists that because Singer, like the plaintiffs in *Conyers*, had access to the CPD website, he, too, had constructive notice of the City's property retrieval procedures. But unlike in *Conyers*, the City has not established that Singer received any notice directing him to its website, nor has it offered evidence of the contents of its website throughout the relevant period. For at least these reasons, the City is not entitled to summary judgment on the analysis in *Conyers*.

8

In addition to the foregoing issues, there remains the fact that a substantial portion of the property seized from Singer's home was listed on the inventory sheet as belonging to his former employer.[3] The City points out that because Singer was not identified as the owner of that property, he would not have received any notice the City might have sent, had it employed additional procedural safeguards, concerning its disposition.[4] It observes further that had Singer tried to follow the second of the procedures set forth on the back of "Copy 4" of the inventory sheet (i.e., the procedure not involving a Section 108 order), "he would have likely been rejected for not being the proper party to retrieve the items." Reply, ECF 86 at 3, 4. These observations do not support summary judgment. To the contrary, they tend to reinforce the impression that the City's procedures—including its apparently unilateral procedure for designating property ownership

---

[3] Given the nature of the criminal charges against Singer and the fact that Singer was also embroiled in several civil lawsuits with his former employer, see *Progressive Care, S.C. v. Singer et al.*, 11-cv-8252 (N.D. Ill.), *Singer v. Progressive Care, S.C. et al*. 11-cv-2679 (N.D. Ill.), it is reasonable to assume that Singer's former employer was unlikely to assist him in recovering the seized property.

[4] The issue of procedural safeguards the City might have used is relevant because due process requires a balancing of three factors: the private interest affected by an official action; the risk of an erroneous deprivation of that interest through the procedures used, and *the probable value of additional or substitute procedural safeguards*; and the probable burden on the government of additional or substitute procedural requirement. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (emphasis added).

on its inventory sheets—were not reasonably calculated to provide owners with notice and an opportunity to be heard prior to disposing of their property, and thus did not satisfy due process requirements.

The remainder of the City's motion warrants only brief discussion. The essence of its argument with respect to Singer's conversion claim is that Singer failed to make a timely demand for the property that remained in the City's possession after the close of his criminal proceedings. In particular, the City emphasizes that Singer was represented by counsel and notes that his criminal attorney successfully retrieved Singer's passport from the City. By the City's lights, these facts illustrate that Singer's counsel "presumably" knew where to go and how to retrieve the remainder of Singer's personal belongings, yet failed to take reasonable efforts to do so. Pl.'s Mem., ECF 70 at 5. But the City's surmise is contradicted by Singer's attorney, who states in an affidavit that he did not know the whereabouts of Singer's property and that he made multiple attempts to learn where it was stored and how to retrieve it but was unsuccessful in these efforts. *See* McQuaid Aff. ECF at ¶¶ 9-10.

Finally, in what reads almost as an after-thought, the City asserts the Illinois Tort Immunity Act and the doctrine of laches as affirmative defenses entitling it to summary judgment. The City quietly abandons the first of these arguments in its reply. As to

10

the second, I am not persuaded, on this record, that a reasonable fact-finder must conclude both that Singer unreasonably delayed in demanding his property and that the City has been materially prejudiced as a result, both of which elements are required to establish laches.

For the foregoing reasons, defendant's motion for summary judgment is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 20, 2022